[Cite as *State v. Schroeder*, 2011-Ohio-2169.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J.<br>Hon. Sheila G. Farmer, J.<br>Hon. John W. Wise, J. |
| Plaintiff-Appellee | |
| -vs- | |
| | Case No. 10CA37 |
| RODNEY SCHROEDER | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:  Appeal from the Richland County Court of
Common Pleas, Case No. 2009CR616D

JUDGMENT:  Affirmed

DATE OF JUDGMENT ENTRY:  May 4, 2011

APPEARANCES:

For Plaintiff-Appellee          For Defendant-Appellant

JAMES J. MAYER, JR.             RANDALL E. FRY
PROSECUTING ATTORNEY            10 West Newlon Place
RICHLAND COUNTY, OHIO           Mansfield, Ohio 44902

BY: KIRSTEN L. PSCHOLKA-GARTNER
Assistant Richland County Prosecutor
38 South Park Street
Mansfield, Ohio 44902

*Hoffman, P.J.*

{¶1} Defendant-appellant Rodney Schroeder appeals his conviction and sentence entered by the Richland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} On November 28, 2008, Appellant and his girlfriend, Heather Mollenkopf, visited The Den, a bar in Mansfield, Ohio. Appellant consumed several beers while at the bar.

{¶3} After 11:00 p.m., Appellant and his girlfriend left the bar in Appellant's truck. Appellant drove, and Mollenkopf was in the passenger seat. Appellant pulled out of the parking lot, driving north on Surges Avenue. The street is a residential area, with a twenty-five mile per hour speed limit, marked with double lines to indicate no passing.

{¶4} Appellant travelled between fifty and sixty-two miles per hour down Surges Avenue. As he approached Walter Avenue, he came upon a red Ford F150 truck being driven by Jack Spreng, who had also been drinking at The Den that evening. Spreng was preparing to turn left onto Walter Avenue.

{¶5} Appellant made a high-speed pass over the double yellow lines, rather than wait for Spreng to turn left. As a result, Appellant sideswiped Spreng's vehicle, causing Spreng to slam on the brakes. Spreng's vehicle became hooked onto Appellant's truck and was dragged a short distance until he slammed his gearshift into park.

{¶6} Appellant did not press the brakes; fishtailing out of control with his foot on the accelerator. He slid sideways on the hill on Surges, going over the curb, and onto

the sidewalk. His truck took out the stop sign at Blanch Avenue, and continued to slide down Surges. Eventually, the truck slammed into a telephone pole at thirty to thirty-five miles per hour. The force of the impact caused the passenger side tire to completely detach from the truck, tipping the vehicle into the pole. As a result, the telephone pole intruded into the truck cabin and the roof caved in. As a result of injuries sustained in the accident, Heather Mollenkopf died of blunt force trauma.

{¶7} At the hospital, the medical personnel noticed a strong odor of alcohol on Appellant's person. He admitted to drinking "a few beers" earlier in the evening. An initial blood test revealed a blood alcohol level of .114 gram percent. A second draw revealed .046 gram percent.

{¶8} As a result, Appellant was indicted on one count of aggravated vehicular homicide as a proximate result of driving under the influence of alcohol, in violation of R.C. 2903.06(A)(1)(a); one count of aggravated vehicular homicide for operating a vehicle recklessly, in violation of R.C. 2903.06(A)(2)(a); one count of driving under the influence of alcohol, in violation of R.C. 4511.19(A)(1)(a); one count of driving under the influence of alcohol, in violation of R.C. 4511.19(A)(1)(B); and one count of driving under the influence of alcohol, in violation of R.C. 4511.19(A)(1)(c).

{¶9} Appellant filed a motion to suppress the initial blood draw arguing the Ohio Department of Health Regulations require the sample be maintained for at least a year. In response, the State dismissed Counts IV and V of the indictment, but the result of the blood alcohol test was admitted to prove recklessness as related to the aggravated vehicular homicide charge in Count II, and to prove impairment as related to the

aggravated vehicular homicide charge in Count I and the driving under the influence charge in Count III.

{¶10} Following a jury trial, Appellant was found not guilty on the aggravated vehicular homicide charge as a proximate result of driving while under the influence of alcohol but guilty of aggravated vehicular homicide for driving recklessly. The jury was unable to reach a verdict on the driving while impaired charge. On March 1, 2010, the trial court sentenced Appellant to the maximum five year sentence.

{¶11} Appellant now appeals, assigning as error:

{¶12} "I. THE JURY'S VERDICT IN FINDING THE DEFENDANT-APPELLANT GUILTY ON COUNT ONE OF AGGRAVATED VEHICULAR HOMICIDE, WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE THUS THE CONVICTION WAS IN VIOLATION OF ARTICLE I, 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMANT [SIC] TO THE UNITED STATES CONSTITUTION.

{¶13} "II. THE TRIAL COURT ERRED IN IMPOSING THE MAXIMUM PRISON SENTENCE ON THE DEFENDANT-APPELLANT IN THIS MATTER."

I.

{¶14} In the first assignment of error, Appellant maintains his conviction for aggravated vehicular homicide for driving recklessly was against the manifest weight and sufficiency of the evidence. We disagree.

{¶15} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment

must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N .E.2d 541 superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.

**{¶16}** Appellant was convicted of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2)(a):

**{¶17}** "(A) No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft, shall cause the death of another or the unlawful termination of another's pregnancy in any of the following ways:

**{¶18}** "***

**{¶19}** "(2) In one of the following ways:

**{¶20}** "(a) Recklessly;

**{¶21}** R.C. 2901.22(C) defines "Recklessness" as:

**{¶22}** "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to

circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

**{¶23}** At trial in this matter, Corey Fultz, an eyewitness to the accident, testified:

**{¶24}** "Q. Which car do you think was going faster, that silver pickup, or was it the other car that you saw that the silver pickup was trying to pass?

**{¶25}** "A. The silver pickup.

**{¶26}** "Q. A lot faster?

**{¶27}** "A. Yes.

**{¶28}** "* * *

**{¶29}** "Q. Corey, I'm going to show you your statement, and this is the one that you told your mom what to write and she wrote down what you told her, is that true?

**{¶30}** "A. Yes.

**{¶31}** "Q. Please read the whole thing to the jury so they know what you told your mom to write the night that you saw the accident.

**{¶32}** " 'A. I seen a car that was going slow coming down Sturges. I seen the silver truck pass the car. The truck went sideways and almost hit a parked car. The truck then went back into the right lane up over the curb and then hit the pole. I thought the truck flipped over. The car turned on a side road. Written by mother Mary Fultz.'

**{¶33}** "Q. And the last thing is, it says written by Mary Fultz. When you say the car turned down a side road, is that that orange car you are talking about that was coming up that turned?

**{¶34}** "A. That's the car that was in front of the truck.

**{¶35}** "Q. The silver truck?

**{¶36}** "A. Yeah, that's the car that the truck passed.

**{¶37}** "Q. Okay, the car that the truck passed.  Now, Attorney Mayer pointed out, you did say that the first car, the car that got passed, was going slow?

**{¶38}** "A. Yes.

**{¶39}** "Q. And you didn't say in there that the silver truck was going fast?

**{¶40}** "A. Yes.

**{¶41}** "Q. But do you remember when myself, Attorney Mayer, Attorney Bishop came to your house?

**{¶42}** "A. Yes.

**{¶43}** "Q. Just a couple days ago?

**{¶44}** "A. Yes.

**{¶45}** "Q. What did you tell us about the silver truck, all three of us?

**{¶46}** "A. It was going fast."

**{¶47}** Tr. at 345; 358-359.

**{¶48}** Jack Spreng, the driver of the vehicle Appellant attempted to pass testified at trial:

**{¶49}** "Q. And do you recall whether there is any cars in back of you?

**{¶50}** "A. I heard a passing gear.

**{¶51}** "Q. You heard a passing gear?

**{¶52}** "A. I heard a passing gear of a vehicle, I seen lights.  I thought it was a police officer or something in pursuit, like a police officer when they accelerate, the passing gear kicks in.  I thought it was a police officer.

**{¶53}** "Q. When you say lights, what kind of lights?

**{¶54}** "A. Headlights.

**{¶55}** "Q. I want to make sure you weren't talking about red and blue lights?

**{¶56}** "A. No, no.

**{¶57}** "Q. So you see headlights in your rearview, I take it?

**{¶58}** "A. Yes.

**{¶59}** "Q. And you hear it accelerate and it makes you think, your first impression is that it might be a police officer going to a call or something?

**{¶60}** "A. Yes.

**{¶61}** "Q. And what goes through your mind in that regard, how do you react to that impression?

**{¶62}** "A. Well, I'm about at the intersection, I will get out of its way. So I get to my intersection, and the next thing I know this vehicle was a flash, passed me on the left side of my vehicle. I had my turn signal on to make my left-hand turn, I always use my turn signals.

**{¶63}** "The next thing I know I heard a snap, it sounded like a shotgun, it tore the mirror off my truck. It didn't dent it, but it caught my front bumper, and when it did that I threw the truck in park and I held onto the brakes because when his bumper, or whoever's bumper it was, caught my bumper, it bent it down and it was pulling my truck and I had my feet buried into the brakes.

**{¶64}** "Q. Let's go back. How fast did this happen?

**{¶65}** "A. (Indicating), it was just a flash.

**{¶66}** "Q. Had you started your turn yet?

**{¶67}** "A. No, I was just getting ready to fell the wheel go towards the yellow line.

**{¶68}** "Q. You heard this acceleration right behind you?

**{¶69}** "A. (Nod indicating yes).

**{¶70}** "Q. You've seen these headlights, how far would you judge these headlights are behind you when you first hear the acceleration and see the headlights?

**{¶71}** "A. Probably just from the stoplight at Sturges and Cline, probably right in that area, where that bank used to be, the credit union.

**{¶72}** "Q. Kind of at the top of the hill?

**{¶73}** "A. Yes.

**{¶74}** "Q. And how close are you to - -

**{¶75}** "A. I'm probably a house and a half away from making my left-hand turn onto Walter Avenue.

**{¶76}** "Q. And before you can initiate that turn, there's a flash that goes by?

**{¶77}** "A. Yeah.

**{¶78}** "Q. Did you know right away that that blast or whatever you described was your mirror getting smashed off?

**{¶79}** "A. No, no.

**{¶80}** "Q. But what is your first instinct?

**{¶81}** "A. I hit the brakes.

**{¶82}** "Q. I think you said fairly plowed the brakes and slammed it into park?

**{¶83}** "A. Shoved it into park, right.

**{¶84}** "Q. And you said it didn't dent, didn't dent what?

**{¶85}** "A. Never put a mark on the truck other than the bumper.

**{¶86}** "Q. We will come to that. What happens after it smashes your mirror, catches your bumper, then what?

**{¶87}** "A. I'm sitting there. My truck is dead stop there in the street.

**{¶88}** "Q. How far would you say it dragged you when it caught your bumper?

**{¶89}** "A. I can't tell you.

**{¶90}** "Q. Well, a long way or a short way?

**{¶91}** "A. Short way.

**{¶92}** "Q. Now, did you see what that vehicle did after it tagged you?

**{¶93}** "A. Yes.

**{¶94}** "Q. What did it do?

**{¶95}** "A. It was heading for a tree on the other side of Walter Avenue.

**{¶96}** "Q. Hang on a second. Let's use this diagram. Do you recognize what's on here?

**{¶97}** "A. Pardon me?

**{¶98}** "* * *

**{¶99}** "A. Sturges, I was coming down this way, right about in here, in here is where the mirror came off and I was getting ready to turn in that intersection. And there usually is a Dodge pickup truck that will sit there.

**{¶100}** "Q. A Dodge pickup usually sits there?

**{¶101}** "A. Yes.

**{¶102}** "Q. Was it sitting there that night?

**{¶103}** "A. No. And right across the Street there's a tree right here, right here in this grass. This vehicle passed me, headed for the tree, whipped it, and it slid all the

way down through to - - this is Blanch right here.  And it was just nothing but - - I mean, I was in shock.  I mean, I just see it every day.  When it started at that tree it slid at an angle, all the way just about to Blanch and it went sideways and wrapped itself around the pole.   After that, I jumped out of my truck - - "

{¶104}  Tr. at 427-431.

{¶105}  Officer Matt Loughman, the first officer to arrive on the scene, testified:

{¶106}  "Q. And what did you observe upon your arrival?

{¶107}  "A.  Upon my arrival I noticed a full-size Chevy pickup truck.  It was slammed sideways into a telephone pole.  A lot of heavy damage to the truck.

{¶108}  "Q. Did you notice if there were any occupants in that silver truck?

{¶109}  "A. Yes.  When I went up to the truck there were two occupants in the front seat of the truck.

{¶110}  "Q. Were you able to figure out who those occupants were?

{¶111}  "A. Not at that time.  Shortly after, yes, I did.

{¶112}  "Q. Who was in the driver's seat of the silver pickup?

{¶113}  "A. In the driver's seat was a Rodney Schroeder.

{¶114}  "Q. How about in the passenger seat?

{¶115}  "A. Heather Mollenkopf.

{¶116}  "Q. Was there another vehicle that had been stuck prior to the silver car hitting the telephone pole?

{¶117}  "A. Yes, there was.

{¶118}  "Q. And could you tell me who was the driver of that vehicle?

{¶119}  "A. That was Jack Spreng.

**{¶120}** "Q. What kind of vehicle was he driving?

**{¶121}** "A. He was driving a Ford F150 pickup truck.

**{¶122}** "Q. The two people, Rodney Schroeder in the driver's seat of the silver pickup, and Heather Mollenkopf, how were they inside the vehicle when you observed it?

**{¶123}** "A. When I got to the vehicle, they were both pinned in. The roof had basically come down, kind of collapsed on both of them, and they were trapped inside the truck.

**{¶124}** "Q. What did you do upon seeing that?

**{¶125}** "A. Upon seeing that I got on my radio and got ahold of our dispatches and to have the fire department, and a rescue squad get there as soon as they could, to step it up.

**{¶126}** "Q. To step it up means hurry up?

**{¶127}** "A. Hurry up, get here as quick as you can.

**{¶128}** "Q. What were the road conditions that night, Officer Loughman?

**{¶129}** "A. Dry. There was nothing on the road. They weren't slippery wet, icy, they were pretty much dry.

**{¶130}** "* * *

**{¶131}** "Q. Are you allowed to put someone through a field sobriety test who has been injured in a collision?

**{¶132}** "A. No.

**{¶133}** "Q. Is the collision itself evidence of impairment?

**{¶134}** "A. Yes.

**{¶135}** "Q. Is high speed, in your experience, evidence of impairment?

**{¶136}** "A. Yes.

**{¶137}** "Q. Do you see people who are intoxicated or driving impaired driving aggressively?

**{¶138}** "A. Yes.

**{¶139}** "Q. Have you had experience with them driving recklessly?

**{¶140}** "A. Yes.

**{¶141}** "Q. Having problems in their judgment?

**{¶142}** "A. Yes.

**{¶143}** "Q. Or motor coordination skills?

**{¶144}** "A. Yes.

**{¶145}** "Q. Those would all be evidence of impairment?

**{¶146}** "A. Correct."

**{¶147}** Tr. at 280-282; 332.

**{¶148}** In addition, the State offered the testimony of other responding officers and an accident reconstructionist whom testified with regard to the excessive rate of speed, and Appellant's attempting to pass Spreng in a double yellow line, no passing area.

**{¶149}** Based upon the testimonial evidence set forth above, we find there was sufficient credible evidence for the jury to find beyond a reasonable doubt Appellant operated his vehicle recklessly, causing the death of Heather Mollenkopf. Appellant travelled at an excessive rate of speed on a residential street. He attempted to pass a vehicle driven by Jack Spreng in a no pass zone, marked with a double yellow line,

resulting in a collision causing his truck to career out of control, striking a telephone pole. The collision caused fatal injuries to Heather Mollenkopf.

{¶150} Appellant's argument regarding Mr. Spreng's contributing to the accident by crossing the yellow lines while Appellant attempted to pass him is inapplicable in a criminal proceeding involving aggravated vehicular homicide. *State v. Langenkamp* (2000), 137 Ohio App.3d 614; *State v. Lyons,* 2003-Ohio-3494.

{¶151} Based upon the above, Appellant's first assignment of error is overruled.

II.

{¶152} Appellant's second assignment of error asserts the trial court erred in imposing the maximum sentence allowed.

{¶153} R.C. 2903.06(B)(1) states:

{¶154} "Whoever violates division (A)(1) or (2) of this section is guilty of aggravated vehicular homicide and shall be punished as provided in divisions (B)(2) and (3) of this section.

{¶155} "***

{¶156} "(3) Except as otherwise provided in this division, aggravated vehicular homicide committed in violation of division (A)(2) of this section is a felony of the third degree. Aggravated vehicular homicide committed in violation of division (A)(2) of this section is a felony of the second degree if, at the time of the offense, the offender was driving under a suspension or cancellation imposed under Chapter 4510. or any other provision of the Revised Code or was operating a motor vehicle or motorcycle, did not have a valid driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege, and was not eligible for renewal

of the offender's driver's license or commercial driver's license without examination under section 4507.10 of the Revised Code or if the offender previously has been convicted of or pleaded guilty to a violation of this section or any traffic-related homicide, manslaughter, or assault offense. The court shall impose a mandatory prison term on the offender when required by division (E) of this section.

{¶157} "In addition to any other sanctions imposed pursuant to this division for a violation of division (A)(2) of this section, the court shall impose upon the offender a class two suspension of the offender's driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege from the range specified in division (A)(2) of section 4510.02 of the Revised Code or, if the offender previously has been convicted of or pleaded guilty to a traffic-related murder, felonious assault, or attempted murder offense, a class one suspension of the offender's driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege as specified in division (A)(1) of that section.

{¶158} "(E) The court shall impose a mandatory prison term on an offender who is convicted of or pleads guilty to a violation of division (A)(1) of this section. If division (B)(2)(c)(i), (ii), (iii), (iv), (v), (vi), (vii), or (viii) of this section applies to an offender who is convicted of or pleads guilty to the violation of division (A)(1) of this section, the court shall impose the mandatory prison term pursuant to section 2929.142 of the Revised Code. The court shall impose a mandatory jail term of at least fifteen days on an offender who is convicted of or pleads guilty to a misdemeanor violation of division (A)(3)(b) of this section and may impose upon the offender a longer jail term as

authorized pursuant to section 2929.24 of the Revised Code. The court shall impose a mandatory prison term on an offender who is convicted of or pleads guilty to a violation of division (A)(2) or (3)(a) of this section or a felony violation of division (A)(3)(b) of this section if either of the following applies:

{¶159} "(1) The offender previously has been convicted of or pleaded guilty to a violation of this section or section 2903.08 of the Revised Code.

{¶160} "(2) At the time of the offense, the offender was driving under suspension or cancellation under Chapter 4510. or any other provision of the Revised Code or was operating a motor vehicle or motorcycle, did not have a valid driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege, and was not eligible for renewal of the offender's driver's license or commercial driver's license without examination under section 4507.10 of the Revised Code."

{¶161} In *State v. Kalish,* 120 Ohio St.3d 23, 2008–Ohio–4912, 896 N.E.2d 124, the Ohio Supreme Court reviewed its decision in *State v. Foster,* 109 Ohio St.3d 1, 2006–Ohio–856, 845 N.E.2d 470, and discussed the affect of the *Foster* decision on felony sentencing. The *Kalish* Court explained, that having severed the judicial fact-finding portions of R.C. 2929.14 in *Foster,* "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Kalish* at paragraphs 1 and 11, citing *Foster* at paragraph 100. See also, *State v. Payne,* 114 Ohio St.3d 502, 2007–Ohio–4642, 873 N.E.2d 306.

**{¶162}** Upon review of the sentencing transcript, we find the trial court properly considered the statutory factors to be considered in felony sentencing, and Appellant's sentence was within the range of possible sentences for the conviction. We find no abuse of discretion in the trial court's determination of sentence. Accordingly, the second assignment of error is overruled.

**{¶163}** Appellant's conviction and sentence in the Richland County Court of Common Pleas are affirmed.

By: Hoffman, P.J.

Farmer, J. and

Wise, J. concur

s/ William B. Hoffman _____
HON. WILLIAM B. HOFFMAN


s/ Sheila G. Farmer _____
HON. SHEILA G. FARMER


s/ John W. Wise _____
HON. JOHN W. WISE

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee              :
                                       :
-vs-                                   :          JUDGMENT ENTRY
                                       :
RODNEY SCHROEDER                       :
                                       :
    Defendant-Appellant             :          Case No. 10CA37

For the reasons stated in our accompanying Opinion, Appellant's conviction and sentence in the Richland County Court of Common Pleas are affirmed. Costs to Appellant.

s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ Sheila G. Farmer_____
HON. SHEILA G. FARMER


s/ John W. Wise_____
HON. JOHN W. WISE